| | |
|---|---|
| 1 | ROBERT S. NELSON (CA SBN 220984) |
|   | RNelson@nelsonlawgroup.net |
| 2 | NELSON LAW GROUP |
|   | 900 Cherry Avenue, Suite 300 |
| 3 | San Bruno, CA  94066 |
|   | Telephone:  (650) 794-2760 |
| 4 | Facsimile:  (650) 794-2761 |

*Attorneys for Plaintiffs*

| WALTER V. SIEBERT *(Pro Hac Vice)* | RAYMOND L. WHEELER (CA SBN 52886) |
|---|---|
| BSiebert@sah.com | RWheeler@mofo.com |
| SHERMAN & HOWARD L.L.C. | SHARYN K. FUNAMURA (CA SBN 193518) |
| 633 Seventeenth Street, Suite 3000 | SFunamura@mofo.com |
| Denver, CO  80202-3622 | MORRISON & FOERSTER LLP |
| Telephone:  (303) 297-2900 | 755 Page Mill Road |
| Facsimile:  (303) 298-0940 | Palo Alto, CA  94304-1018 |
|  | Telephone:  (650) 813-5600 |
|  | Facsimile:  (650) 494-0792 |

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGELA BADAMI, LENNON BRONSEMA, BENJAMIN CAMPOPIANO, KATHRYN RAVEN, AUDREY WARD, and all others similarly situated, | Case No.   C-07-3465 JSW |
| Plaintiffs, | **DECLARATION OF ROBERT S. NELSON IN SUPPORT OF MOTION FOR ORDER:  (1) PROVISIONALLY CERTIFYING SETTLEMENT CLASSES; (2) PRELIMINARILY APPROVING CLASS ACTION SETTLEMENT AND PLAN OF DISTRIBUTION; (3) DIRECTING DISTRIBUTION OF NOTICE OF THE SETTLEMENT; AND (4) SETTING A SCHEDULE FOR THE FINAL SETTLEMENT APPROVAL PROCESS** |
| v. | |
| GRASSROOTS CAMPAIGNS, INC., | |
| Defendant. | |
| | Date: January 28, 2008 |
| | Time:  9:00 a.m. |
| | Judge  Hon. Jeffrey S. White |
| | Ctrm: 2 |

**DECL. OF ROBERT S. NELSON ISO MOTION TO APPROVE SETTLEMENT**
**Case No. C-07-3465 JSW**
\283325.1EMPLOY

I, ROBERT S. NELSON, declare as follows:

1. I have personal knowledge of the facts stated herein, and could testify competently thereto if called upon to do so.

2. I am an attorney admitted to practice in the State of California and in the Northern and Central Districts of California. I am attorney-of-record for Plaintiffs in this action.

3. I am the principal of the Nelson Law Group ("NLG"), a San Bruno, California-based law practice specializing exclusively in labor and employment law. NLG has been in existence since June 2006. Prior to that time, I practiced labor and employment law with the firms Curiale Dellaverson Hirschfeld & Kraemer LLP (from 2004 until 2006), a California-based, management-side labor and employment firm; and Fisher & Phillips LLP (from 2002 until 2004), a national labor and employment firm with offices in the San Francisco Bay Area.

4. Prior to founding NLG, I was actively involved in the defense of several wage-and-hour class and/or collective actions, including *Dudash v. Varnell Struck & Associates*, C-04-02748 MHP. Since founding NLG, I have served as lead counsel in both the present case and *Cayer v. Washington Mutual Bank*, CV-07-00875 JSW, a wage-and-hour class and collective action currently pending before this Court. In addition, I am currently serving as local counsel in *Jaffe, et al. v. Morgan Stanley DW, Inc.*, C-06-03903 TEH, a discrimination class action under Title VII.

5. In January 2007, I was contacted by Plaintiffs Ben Campopiano and Angela Badami about the prospect of taking this case. I met with Mr. Campopiano and Ms. Badami at length, and also had several telephone conversations with them. Mr. Campopiano and Ms. Badami (and subsequently Plaintiffs Kathryn Raven and Audrey Ward, who I also met with in January 2007) told me about their experiences as former employees of Defendant Grassroots Campaigns, Inc. ("GCI"). Specifically, they described to me, in great detail: GCI's business; their respective job titles (all had worked as either Canvass Directors, Assistant Canvass Directors or Field Organizers); the job duties of each different job; how much they were paid; how much they worked; whether and to what extent they could document how much they worked; whether

**DECL. OF ROBERT S. NELSON ISO MOTION TO APPROVE SETTLEMENT**
**Case No. C-07-3465 JSW**

1

\283325.1EMPLOY

1  they were required by GCI to work as much as they did; and their respective dates of

2  employment. Mr. Campopiano also told me that he had been required to work an unpaid

3  "observation" day at the start of his employment with GCI.

4      6.    Based on my discussions with the Plaintiffs, I determined that they likely had

5  viable claims for unpaid overtime, minimum wages, meal and rest break payments and other fees

6  and penalties under both California state law and the federal Fair Labor Standards Act.

7      7.    After meeting with Plaintiffs, I began thoroughly researching GCI and its business.

8  Specifically, I accessed and read all pages, links and attachments to GCI's web site; reviewed

9  documents that were provided to me by Plaintiffs regarding work conditions and/or requirements

10 at GCI; and conducted online research about GCI and its clients, including researching the

11 amount of payment GCI has received from the Democratic National Committee ("DNC") and

12 MoveOn.org, two of the company's biggest clients.

13     8.    As part of my research, I also requested a credit and risk report of the company by

14 Dun & Bradstreet ("D&B"). The D&B official to whom I spoke indicated that GCI did not

15 appear to own any real estate or significant assets anywhere throughout the country; that it had

16 paid numerous bills and/or debts late; and that it had a below-average credit rating.

17     9.    Based on the above-noted research and findings, I determined that GCI was a

18 relatively new company that provided fundraising/consulting services to the DNC, MoveOn and

19 other progressive causes and/or candidates; it appeared to have no tangible assets or inventory;

20 and it had a questionable credit rating and history of bill payments. I therefore determined that

21 GCI was a likely bankruptcy risk if liability and/or litigation costs became too high.

22     10.   Between August and November 2007, 36 people signed and sent me Consent to

23 Join forms seeking to opt into this case. Approximately 24 of them had worked for GCI outside

24 California as Canvass Directors, Assistant Canvass Directors and/or Field Organizers; the rest had

25 either worked for GCI in California, or in other jobs. I interviewed all the people who opted in at

26 length, asking them substantially the same questions I previously asked the named Plaintiffs. I

27 also requested and reviewed any and all documents the opt ins had regarding GCI.

28

11. Based on the above-noted interviews and research, I determined that GCI maintained uniform personnel and management structures across branch offices, and that the practices that appeared to give Plaintiffs viable claims for overtime and/or minimum wage violations were applied uniformly to GCI's other employees.

12. In or about early October 2007, the parties agreed to conduct early mediation in this case. As a condition of early mediation, I requested that GCI voluntarily provide information needed to calculate the existence and/or extent of class claims, including the numbers of people who worked in jobs that Plaintiffs alleged had been mistakenly classified as exempt from state and/or federal overtime and minimum wage requirements, as well as the amount of time they worked for GCI. I furthermore requested that GCI provide the number of people who had been required to work unpaid observation days for which they were not paid.

13. In mid-November 2007, I received a letter from counsel for GCI, dated November 14, 2007, that substantially complied with my request for information. The letter indicated that 124 people had worked in California in positions that Plaintiffs claimed had been misclassified as exempt from overtime/minimum wage requirements; and that 1,942 people had been required to work unpaid observation days in California. The letter was accompanied by a spreadsheet indicating the total number of weeks worked in California by employees in allegedly misclassified jobs. True and correct copies of both the letter and the spreadsheet are attached as Exhibit 1 to this Declaration.

14. Documents available on GCI's web site, and which were provided to me by Plaintiffs and opt ins, indicated how much time GCI's employees were expected to work each day (and week). Using that information, the information GCI voluntarily provided to me, and information provided by Plaintiffs and opt ins, I was able to thoroughly and accurately estimate:

- How many employees were in each class of employees that had been subject to GCI's questionable employment practices;
- How many days and/or weeks each of those people worked (members of the Salaried Sublcass worked approximately 1,498.9 weeks; the Opt Ins will have

**DECL. OF ROBERT S. NELSON ISO MOTION TO APPROVE SETTLEMENT**
Case No. C-07-3465 JSW
\283325.1EMPLOY

3

worked approximately 400 weeks[1]);

- How many unpaid observation days employees were required to work (one per employee);

- How many hours each person was expected to work each week (anywhere from 50 to 60 overtime hours each week for Canvass Directors, Assistant Canvass Directors and Field Organizers; unpaid observation days lasted approximately 9.5 hours);

- How much each person was paid ($24,000.00 per year for salaried employees, or $11.49 per hour);

- How much each person had already been paid ($455.00 per week for salaried employees); and

- How much each person was still owed in wages (between $490.00 and $1,200.00 per week for salaried employees in California, and between $830.00 and $930.00 per week for salaried employees outside of California; $70.00 for employees who worked an unpaid observation day in California).

15. On November 21, 2007, the parties had an all-day mediation with Judge Edward R. Infante (Ret.), one of the most respected wage-and-hour class action mediators in California. A recent reader survey by The Recorder legal newspaper ranked Judge Infante as the best mediator in the San Francisco Bay Area.

16. The mediation was conduced at arms' length via "caucus" negotiations facilitated by Judge Infante (i.e., negotiations where the parties are kept in separate rooms and the mediator shuttles offers and responses between them). At the conclusion of the mediation, the parties agreed to settle the claims of a defined settlement class consisting of everyone who had worked for GCI in California for a set salary that is less than the state's minimum wage; everyone who

---

[1] Given the current number of Opt Ins, their respective dates of employment and the anticipated number of additional Opt Ins prior to preliminary approval, I estimate that the Opt Ins will have worked a total of about 400 weeks for GCI. I have been contacted by two people since the parties' November 21, 2007 mediation who have inquired about, and/or expressed interest in, opting into the case.

**DECL. OF ROBERT S. NELSON ISO MOTION TO APPROVE SETTLEMENT**
**Case No. C-07-3465 JSW**
\283325.1EMPLOY

4

worked an unpaid observation day, both in and outside of California; and everyone who affirmatively opted into the case. The settlement terms are accurately described in the Joint Stipulation of Settlement and Release ("Stipulation") filed concurrently with this Motion.

17. After the mediation, Judge Infante commended both parties for negotiating in good faith and said, in joint session, that he "strongly supported" the settlement agreement. I also believed the settlement was appropriate and in the best interests of the class, given the apparent risk of bankruptcy if the case proceeded to trial; the possibility that some of Plaintiffs' claims would not succeed if the case went to trial; and the significant time, energy and money that would have to be invested to take the case to trial. Furthermore, GCI could appeal even a favorable verdict, thereby further endangering and/or delaying recovery if the case went to trial.

18. I devised a payment allocation formula that is intended to maximize payments to members of the settlement class. The parties stipulate that the allocation formula is fair and reasonable. The formula is as follows:

19. To determine overall percentages of the Net Settlement Payment, I determined a base-level share value that represents *both*: (1) the claims of the Non-Payment Subclass (i.e., the total claims of each subclass member are worth one share); and (2) weeks worked by the Salaried Subclass and Opt Ins (i.e., each week worked is worth one share).[2] I then designated multipliers to the various subclasses to account for the relative strengths and/or size of their respective claims. I assigned a multiplier of 8 to claims of the Salaried Class; 1 to claims of the Non-Payment Subclass; and 3 to the claims of the Opt Ins. These calculations can be diagrammed as follows:

---

[2] Assigning a base-level share value was complicated by the variation in claims between members of the Non-Payment Subclass and everyone else. Non-Payment Subclass members have uniform, one-time-only claims (i.e., each member of the subclass worked one day for which they were not paid); in contrast, members of the Salaried Subclass and the Opt Ins have claims that vary significantly in both duration (i.e., class members sought overtime and/or minimum wages for extended periods that they work) and relative strength (GCI essentially admitted to claims by the Salaried Subclass; it vowed to vigorously contest those of the opt ins).

|  | **Total Shares** | **Multiplier** | **Total # Shares** | **% of Settlement** |
|---|---|---|---|---|
| **Salaried Subclass** | 1,498.9 | 8 | 11,991.2 | 79% |
| **California Non-Payment Class** | 1,942 | 1 | 1,942 | 12% |
| **Opt ins** | 400 | 2 | 800 | 9% |

20. To calculate Salaried Subclass members' individual allotments, the Claims Administrator will first calculate 79 percent of the Net Settlement Payment. That number will then be divided by the total number of work weeks for subclass members who do not opt out. The resulting figure will be the weekly allotment for members of the Salaried Subclass. That figure can then be multiplied by the total number of weeks each subclass member worked to determine individual payments. This calculation is intended to give members of the Salaried Subclass at least $215.00 per week that they worked.

| **Total # Work Weeks**[3] | **Net Settlement Share**[4] | **Weekly Allotment** |
|---|---|---|
| 1,498.9 | $325,850.00 | $216.88 |

21. To calculate individual allotments for the California Non-Payment Subclass, the Claims Administrator will first calculate 12 percent of the Net Settlement Payment. That number will then be divided by the total number of members of the Non-Payment Subclass who do not opt out (i.e., 1,942 minus any opt outs). The resulting figure will be the *total* allotment for

---

[3] Based on the total number of weeks worked by putative class members. This figure will decrease (thereby increasing allotments for individual members) if members opt out.

[4] Assuming a Net Settlement Payment of $411,500.00 ($600,00.00 minus $150,000.00 for attorneys' fees; $8,500.00 for attorney costs; $10,000.00 for incentive payments; and $20,000.00 for notice and claims administration).

**DECL. OF ROBERT S. NELSON ISO MOTION TO APPROVE SETTLEMENT**
**Case No. C-07-3465 JSW**
\283325.1EMPLOY

6

members of the California Non-Payment Subclass. This calculation is intended to give members of the Non-Payment Subclass at least $25.00 each.

| Total # Class Members | Net Settlement Share | Total Member Allotment |
|---|---|---|
| 1,942 | $49,380.00 | $25.42 |

22. To calculate individual allotments for the Opt Ins, the Claims Administrator will first calculate 9 percent of the Net Settlement Payment. Calculation of allotments to the Opt Ins is somewhat complicated given that Opt Ins will include members of the Canvass Director, Assistant Director and Field Organizer Classes ("Exempt Classes"), as well as members of the Non-California Non-Payment Class; claims of the Exempt Classes include time and multiplier components, whereas the Non-California Non-Payment Class requires only a lump sum payment. Opt Ins who are members of the Non-California Non-Payment Subclass will be paid $25.00 each, just like members of the California Non-Payment Subclass. The remaining number will then be divided by the total number of work weeks and/or observation days for Opt Ins who are members of the Exempt Classes. The resulting figure can then be multiplied by the total number of weeks each Exempt Opt In worked to determine individual payments. This calculation is intended to give Exempt Opt Ins approximately $92.00 per week that they worked.[5]

| Total # Work Weeks | Net Settlement Share (NSS) | NSS Minus Non-Pay Opt-Ins[6] | Allotments |
|---|---|---|---|
| Approx. 400 | $37,035.00 | $36,785.00 | $91.96 (per week) |
|  |  |  | $25.00 (per obs. day) |

---

[5] Claims by Opt Ins who are members of the Non-California Non-Payment Subclass will be sufficiently small to as not to significantly affect these calculations.

[6] Assuming 10 members of the Non-California Non-Payment Class opt in (at $25.00 per person, a total of $250.00 is subtracted from the Opt Ins' Net Settlement Share).

**DECL. OF ROBERT S. NELSON ISO MOTION TO APPROVE SETTLEMENT**
**Case No. C-07-3465 JSW**
\283325.1EMPLOY

7

23. I believe that the proposed Notice of Proposed Class Action Settlement and Settlement Hearing that is being filed concurrently with this Declaration will provide fair and adequate notice to absent class members. I also believe the parties' plans to circulate the notice, allow class members the opportunity to object and/or opt out of the settlement (within proscribed time periods), and ultimately distribute payment allocations meet all the requirements of both due process and the Federal Rules of Civil Procedure.

24. I am committed to representing Plaintiffs, opt ins and unnamed class members in this matter, regardless whether the case settles or goes to trial. In the event that settlement is approved, I will devote significant time, energy and resources to ensure that monitoring and/or reporting requirements set forth in the parties' Settlement Agreement are completed.

25. I support the Stipulation and will execute it in the form that is filed concurrently with this Motion. I am informed and believe that the named Plaintiffs, GCI and its counsel also support the Stipulation and will execute it, as is.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed this twentieth day of December, 2007.

                                            _____/S/ Robert S. Nelson_____
                                                     Robert S. Nelson