1  ROBERT S. NELSON (CA SBN 220984)
   RNelson@nelsonlawgroup.net
2  NELSON LAW GROUP
   900 Cherry Avenue, Suite 300
3  San Bruno, CA 94066
   Telephone: (650) 794-2760
4  Facsimile: (650) 794-2761

5  *Attorneys for Plaintiffs*

6  WALTER V. SIEBERT *(Pro Hac Vice)*      RAYMOND L. WHEELER (CA SBN 52886)
   BSiebert@sah.com                         RWheeler@mofo.com
7  SHERMAN & HOWARD L.L.C.                  SHARYN K. FUNAMURA (CA SBN 193518)
   633 Seventeenth Street, Suite 3000       SFunamura@mofo.com
8  Denver, CO 80202-3622                    MORRISON & FOERSTER LLP
   Telephone: (303) 297-2900                755 Page Mill Road
9  Facsimile: (303) 298-0940                Palo Alto, CA 94304-1018
                                            Telephone: (650) 813-5600
10                                          Facsimile: (650) 494-0792

11 *Attorneys for Defendant*

12

13                      UNITED STATES DISTRICT COURT

14                    NORTHERN DISTRICT OF CALIFORNIA

15                        SAN FRANCISCO DIVISION

16

17 ANGELA BADAMI, LENNON BRONSEMA,          Case No.    C-07-3465 JSW
   BENJAMIN CAMPOPIANO, KATHRYN
18 RAVEN, AUDREY WARD, and all others       **DECLARATION OF ROBERT S.**
   similarly situated,                      **NELSON IN SUPPORT OF JOINT**
19                                          **MOTION FOR ORDER: (1)**
                    Plaintiffs,             **GRANTING FINAL APPROVAL**
20                                          **TO THE PARTIES' CLASS**
            v.                              **ACTION SETTLEMENT; (2)**
21                                          **FINALLY CERTIFYING THE**
   GRASSROOTS CAMPAIGNS, INC.,              **PROPOSED SETTLEMENT**
22                                          **CLASS; (3) FINALLY APPROVING**
                                            **THE PROPOSED SETTLEMENT**
23                  Defendant.              **AGREEMENT; AND (4)**
                                            **AFFIRMING PRIOR RULINGS**
24                                          **AND FINDINGS FROM THE**
                                            **PRELIMINARY APPROVAL**
25                                          **ORDER**

26                                          Date: June 27, 2008
                                            Time: 9:00 a.m.
27                                          Judge Hon. Jeffrey S. White
                                            Ctrm: 2
28

**DECL. OF ROBERT S. NELSON ISO MOTION FOR FINAL SETTLEMENT APPROVAL**
**Case No. C-07-3465 JSW**
\283325.1EMPLOY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, ROBERT S. NELSON, declare as follows:

1.    I have personal knowledge of the facts stated herein, and could testify competently thereto if called upon to do so.

2.    I am an attorney admitted to practice in the State of California and in the Northern and Central Districts of California.  I am attorney-of-record for Plaintiffs in this action.

3.    I am the principal of the Nelson Law Group ("NLG"), a San Bruno, California-based law practice specializing exclusively in labor and employment law.  NLG has been in existence since June 2006.  Prior to that time, I practiced labor and employment law with the firms Curiale Dellaverson Hirschfeld & Kraemer LLP (from 2004 until 2006), a California-based, management-side labor and employment firm; and Fisher & Phillips LLP (from 2002 until 2004), a national labor and employment firm with offices in the San Francisco Bay Area.

4.    Prior to founding NLG, I was actively involved in the defense of several wage-and-hour class and/or collective actions, including *Dudash v. Varnell Struck & Associates*, C-04-02748 MHP.  Since founding NLG, I have served as lead counsel in both the present case and *Cayer v. Washington Mutual Bank*, CV-07-00875 JSW, a wage-and-hour class and collective action currently pending before this Court.  In addition, I am currently serving as local counsel in *Jaffe, et al. v. Morgan Stanley DW, Inc.*, C-06-03903 TEH, a discrimination class action under Title VII.

5.    In January 2007, I was contacted by Plaintiffs Ben Campopiano and Angela Badami about the prospect of taking this case.  I met with Mr. Campopiano and Ms. Badami at length, and also had several telephone conversations with them.  Mr. Campopiano and Ms. Badami (and subsequently Plaintiffs Kathryn Raven and Audrey Ward, who I also met with in January 2007) told me about their experiences as former employees of Defendant Grassroots Campaigns, Inc. ("GCI").  Specifically, they described to me, in great detail: GCI's business; their respective job titles (all had worked as either Canvass Directors, Assistant Canvass Directors or Field Organizers); the job duties of each different job; how much they were paid; how much they worked; whether and to what extent they could document how much they worked; whether

**DECL. OF ROBERT S. NELSON ISO MOTION FOR FINAL SETTLEMENT APPROVAL**
**Case No. C-07-3465 JSW**

1

\283325.1EMPLOY

they were required by GCI to work as much as they did; and their respective dates of employment.  Mr. Campopiano also told me that he had been required to work an unpaid "observation" day at the start of his employment with GCI.

6.     After meeting with Plaintiffs, I began thoroughly researching GCI and its business. Specifically, I accessed and read all pages, links and attachments to GCI's web site; reviewed documents that were provided to me by Plaintiffs regarding work conditions and/or requirements at GCI; and conducted online research about GCI and its clients, including researching the amount of payment GCI has received from the Democratic National Committee ("DNC") and MoveOn.org, two of the company's biggest clients.

7.     As part of my research, I also requested a credit and risk report of the company by Dun & Bradstreet ("D&B").  The D&B official to whom I spoke indicated that GCI did not appear to own any real estate or significant assets anywhere throughout the country; that it had paid numerous bills and/or debts late; and that it had a below-average credit rating.

8.     Based on the above-noted research and findings, I determined that GCI was a relatively new company that provided fundraising/consulting services to the DNC, MoveOn and other progressive causes and/or candidates; it appeared to have no tangible assets or inventory; and it had a questionable credit rating and history of bill payments.  I therefore determined that GCI was a likely bankruptcy risk if liability and/or litigation costs became too high.

9.     Between August and November 2007, 36 people signed and sent me Consent to Join forms seeking to opt into this case.  Approximately 24 of them had worked for GCI outside California as Canvass Directors, Assistant Canvass Directors and/or Field Organizers; the rest had either worked for GCI in California, or in other jobs.  I interviewed all the people who opted in at length, asking them substantially the same questions I previously asked the named Plaintiffs.  I also requested and reviewed any and all documents the opt ins had regarding GCI.

10.     In or about early October 2007, the parties agreed to conduct early mediation in this case.  As a condition of early mediation, I requested that GCI voluntarily provide information

needed to calculate the existence and/or extent of class claims, including the numbers of people who worked in jobs that Plaintiffs alleged had been mistakenly classified as exempt from state and/or federal overtime and minimum wage requirements, as well as the amount of time they worked for GCI. I furthermore requested that GCI provide the number of people who had been required to work unpaid observation days for which they were not paid.

11.    In mid-November 2007, I received a letter from counsel for GCI, dated November 14, 2007, that substantially complied with my request for information. The letter indicated that 124 people had worked in California in positions that Plaintiffs claimed had been misclassified as exempt from overtime/minimum wage requirements; and that 1,942 people had been required to work unpaid observation days in California. The letter was accompanied by a spreadsheet indicating the total number of weeks worked in California by employees in allegedly misclassified jobs.

12.    Documents available on GCI's web site, and which were provided to me by Plaintiffs and opt ins, indicated how much time GCI's employees were expected to work each day (and week). Using that information, the information GCI voluntarily provided to me, and information provided by Plaintiffs and opt ins, I was able to thoroughly and accurately estimate:

- How many employees were in each class of employees that had been subject to GCI's questionable employment practices;

- How many days and/or weeks each of those people worked (members of the Salaried Subclass worked approximately 1,498.9 weeks; the Opt Ins will have worked approximately 400 weeks[1]);

- How many unpaid observation days employees were required to work (one per employee);

---

[1] Given the current number of Opt Ins, their respective dates of employment and the anticipated number of additional Opt Ins prior to preliminary approval, I estimate that the Opt Ins will have worked a total of about 400 weeks for GCI. I have been contacted by two people since the parties' November 21, 2007 mediation who have inquired about, and/or expressed interest in, opting into the case.

**DECL. OF ROBERT S. NELSON ISO MOTION FOR FINAL SETTLEMENT APPROVAL**
**Case No. C-07-3465 JSW**                                                                                          3
\283325.1EMPLOY

- How many hours each person was expected to work each week (anywhere from 50 to 60 overtime hours each week for Canvass Directors, Assistant Canvass Directors and Field Organizers; unpaid observation days lasted approximately 9.5 hours);

- How much each person was paid ($24,000.00 per year for salaried employees, or $11.49 per hour);

- How much each person had already been paid ($455.00 per week for salaried employees); and

- How much each person was still owed in wages (between $490.00 and $1,200.00 per week for salaried employees in California, and between $830.00 and $930.00 per week for salaried employees outside of California; $70.00 for employees who worked an unpaid observation day in California).

13.     On November 21, 2007, the parties had an all-day mediation with Judge Edward R. Infante (Ret.), one of the most respected wage-and-hour class action mediators in California. A recent reader survey by The Recorder legal newspaper ranked Judge Infante as the best mediator in the San Francisco Bay Area.

14.     The mediation was conduced at arms' length via "caucus" negotiations facilitated by Judge Infante (i.e., negotiations where the parties are kept in separate rooms and the mediator shuttles offers and responses between them).  At the conclusion of the mediation, the parties agreed to settle the claims of a defined settlement class consisting of everyone who had worked for GCI in California for a set salary that is less than the state's minimum wage; everyone who worked an unpaid observation day, both in and outside of California; and everyone who affirmatively opted into the case.  The settlement terms are accurately described in the Joint Stipulation of Settlement and Release ("Stipulation") filed concurrently with this Motion.

15.     After the mediation, Judge Infante commended both parties for negotiating in good faith and said, in joint session, that he "strongly supported" the settlement agreement.  I also believe that the settlement is fair, reasonable and in the best interests of the class, given the

apparent risk of bankruptcy if the case proceeded to trial; the possibility that some of Plaintiffs' claims would not succeed if the case went to trial; and the significant time, energy and money that would have to be invested to take the case to trial.  Furthermore, GCI could appeal even a favorable verdict, thereby further endangering and/or delaying recovery if the case went to trial.

16.    I devised a payment allocation formula that is intended to maximize payments to members of the settlement class.  The parties stipulate that the allocation formula is fair and reasonable.  The formula is as follows:

17.    To determine overall percentages of the Net Settlement Payment, I determined a base-level share value that represents *both*:  (1) the claims of the Non-Payment Subclass (i.e., the total claims of each subclass member are worth one share); and (2) weeks worked by the Salaried Subclass and Opt Ins (i.e., each week worked is worth one share).[2]  I then designated multipliers to the various subclasses to account for the relative strengths and/or size of their respective claims.  I assigned a multiplier of 8 to claims of the Salaried Class; 1 to claims of the Non-Payment Subclass; and 3 to the claims of the Opt Ins.  These calculations can be diagrammed as follows:

|  | Total Shares | Multiplier | Total # Shares | % of Settlement |
|---|---|---|---|---|
| **Salaried Subclass** | 1,498.9 | 8 | 11,991.2 | 79% |
| **California Non-Payment Class** | 1,942 | 1 | 1,942 | 12% |
| **Opt ins** | 400 | 2 | 800 | 9% |

[2] Assigning a base-level share value was complicated by the variation in claims between members of the Non-Payment Subclass and everyone else.  Non-Payment Subclass members have uniform, one-time-only claims (i.e., each member of the subclass worked one day for which they were not paid); in contrast, members of the Salaried Subclass and the Opt Ins have claims that vary significantly in both duration (i.e., class members sought overtime and/or minimum wages for extended periods that they work) and relative strength (GCI essentially admitted to claims by the Salaried Subclass; it vowed to vigorously contest those of the opt ins).

1

2

3

4

5

6

7

8

18.     To calculate Salaried Subclass members' individual allotments, the Claims Administrator will first calculate 79 percent of the Net Settlement Payment.  That number will then be divided by the total number of work weeks for subclass members who do not opt out. The resulting figure will be the weekly allotment for members of the Salaried Subclass.  That figure can then be multiplied by the total number of weeks each subclass member worked to determine individual payments.  This calculation is intended to give members of the Salaried Subclass at least $215.00 per week that they worked.

9

10

11

| Total # Work Weeks[3] | Net Settlement Share[4] | Weekly Allotment |
|---|---|---|
| 1,498.9 | $325,850.00 | $216.88 |

12

13

14

15

16

17

18

19

19.     To calculate individual allotments for the California Non-Payment Subclass, the Claims Administrator will first calculate 12 percent of the Net Settlement Payment.  That number will then be divided by the total number of members of the Non-Payment Subclass who do not opt out (i.e., 1,942 minus any opt outs).  The resulting figure will be the *total* allotment for members of the California Non-Payment Subclass.  This calculation is intended to give members of the Non-Payment Subclass at least $25.00 each.

20

21

| Total # Class Members | Net Settlement Share | Total Member Allotment |
|---|---|---|
| 1,942 | $49,380.00 | $25.42 |

22

23

24

25

26

27

28

[3] Based on the total number of weeks worked by putative class members.  This figure will decrease (thereby increasing allotments for individual members) per the weeks worked by members who opt out.

[4] Assuming a Net Settlement Payment of $411,500.00 ($600,00.00 minus $150,000.00 for attorneys' fees; $8,500.00 for attorney costs; $10,000.00 for incentive payments; and $20,000.00 for notice and claims administration).

20.     To calculate individual allotments for the Opt Ins, the Claims Administrator will first calculate 9 percent of the Net Settlement Payment.  Calculation of allotments to the Opt Ins is somewhat complicated given that Opt Ins will include members of the Canvass Director, Assistant Director and Field Organizer Classes ("Exempt Classes"), as well as members of the Non-California Non-Payment Class; claims of the Exempt Classes include time and multiplier components, whereas the Non-California Non-Payment Class requires only a lump sum payment. Opt Ins who are members of the Non-California Non-Payment Subclass will be paid $25.00 each, just like members of the California Non-Payment Subclass.  The remaining number will then be divided by the total number of work weeks and/or observation days for Opt Ins who are members of the Exempt Classes.  The resulting figure can then be multiplied by the total number of weeks each Exempt Opt In worked to determine individual payments.  This calculation is intended to give Exempt Opt Ins approximately $92.00 per week that they worked.

| Total # Work Weeks | Net Settlement Share (NSS) | NSS Minus Non-Pay Opt-Ins[5] | Allotments |
|---|---|---|---|
| Approx. 400 | $37,035.00 | $36,785.00 | $91.96 (per week) |
| | | | $25.00 (per obs. day) |

21.     The parties jointly retained Gilardi & Co., LLC ("Gilardi"), a San Rafael-based claims administrator, to handle both notice distribution and ultimate payment of settlement shares in this case.  I have been in regular contact with representatives of Gilardi since February 2008. In mid-March 2008, I was informed by a representative of Gilardi, Maria Hanken, that the company had received last-known addresses for members of the Settlement Class from GCI, and that Gilardi would then use that information to send copies of the Settlement Notice out to the Settlement Class by March 28, 2008, the deadline for mailing per the terms of the parties'

---

[5] Estimated by assuming approximately 10 members of the Non-California Non-Payment Class opt in (at $25.00 per person, a total of $250.00 is subtracted from the Opt Ins' Net Settlement Share).

1

2

3

4

Settlement Agreement.  On or about March 31, 2008, Ms. Hanken called me and said that Gilardi had in fact mailed copies of the Notice on March 28 to the last-known addresses of 2,091 Class Members, the entire Settlement Class.

22.    I remained in regular contact with Gilardi representatives after the Notices were

5

6

7

8

9

10

11

12

13

14

sent.  Ryanne Fitzgerald, another Gilardi representative, provided me with regular updates of how many Notices were returned as undeliverable, and how many Class Members contacted Gilardi to question, opt out of, or object to the Settlement.  Ms. Fitzgerald told me that, of the original 2,091 Notices that Gilardi mailed, approximately 373 were returned as undeliverable.  Ms. Fitzgerald told me that approximately 12 of the returned Notices contained forwarding addresses; Gilardi immediately re-mailed the Notices to those new addresses.  Ms. Fitzgerald furthermore explained that Gilardi performed "skip trace" searches for the remaining 360 returned Notices that did not contain new forwarding addresses.  Through those searches, Gilardi was able to locate new addresses for approximately 300 of the undeliverable Notices; the company then re-mailed the Notices to those new addresses.

15

16

17

18

19

20

21

23.    On May 12, 2008, the deadline for Class Members to object to and/or opt out of the Settlement, Ms. Fitzgerald sent me an email summarizing the numbers of Class Members who had opted out of, and/or objected to, the Settlement as of that date.  According to Ms. Fitzgerald's email, 17 people returned "completed" opt-out forms (i.e., forms that were correctly filled out and signed); another 7 people returned "incomplete" opt-out forms (i.e., forms that were returned but were either not fully filled out, and/or were not signed).  The parties jointly agreed to treat incomplete opt outs as effective opt outs for the purposes of this Settlement.

22

23

24.    According to Ms. Fitzgerald's email, no Class Members objected to the Settlement as of May 12, 2008.

24

25

26

27

25.    Sometime after April 1, 2008, I received a copy of a letter from Richard Aaron Mead, who purported to be a member of the Settlement Class; the original of the letter was addressed to the Court.  The letter generally expressed satisfaction with the parties' settlement,

28

**DECL. OF ROBERT S. NELSON ISO MOTION FOR FINAL SETTLEMENT APPROVAL**
**Case No. C-07-3465 JSW**
\283325.1EMPLOY

8

specifically saying that the author was "very much in favor of the Settlement." A true and correct copy of the letter I received from Mr. Mead is attached as Exhibit 1 to this Declaration.

26. Sometime after April 28, 2008, I received a copy of a letter from Teri Solomo, who purported to be a member of the Settlement Class; the original of the letter was addressed to the Court. The letter generally expressed satisfaction with the parties' settlement, specifically saying that the author was "totally in agreement with the lawsuit against" GCI. A true and correct copy of the letter I received from Mr. Mead is attached as Exhibit 2 to this Declaration.

27. In addition to the above-noted letters, since April 2008 I have received numerous calls from Class Members expressing support for, and appreciation of, the Settlement.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed this twenty-third day of May, 2007.


                                              _____/S/ Robert S. Nelson_____
                                                      Robert S. Nelson

**DECL. OF ROBERT S. NELSON ISO MOTION FOR FINAL SETTLEMENT APPROVAL**
**Case No. C-07-3465 JSW**                                                    9
\283325.1EMPLOY