ROBERT S. NELSON (CA SBN 220984)
RNelson@nelsonlawgroup.net
NELSON LAW GROUP
900 Cherry Avenue, Suite 300
San Bruno, CA  94066
Telephone:  (650) 794-2760
Facsimile:  (650) 794-2761

*Attorneys for Plaintiffs*

WALTER V. SIEBERT *(Pro Hac Vice)*
BSiebert@sah.com
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO  80202-3622
Telephone:  (303) 297-2900
Facsimile:  (303) 298-0940

RAYMOND L. WHEELER (CA SBN 52886)
RWheeler@mofo.com
SHARYN K. FUNAMURA (CA SBN 193518)
SFunamura@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304-1018
Telephone:  (650) 813-5600
Facsimile:  (650) 494-0792

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGELA BADAMI, LENNON BRONSEMA, BENJAMIN CAMPOPIANO, KATHRYN RAVEN, AUDREY WARD, and all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>GRASSROOTS CAMPAIGNS, INC.,<br><br>          Defendant. | Case No.   C-07-3465 JSW<br><br>**DECLARATION OF ROBERT S. NELSON IN SUPPORT OF PLAINTIFFS' APPLICATION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF COSTS AND EXPENSES**<br><br>Date: June 27, 2008<br>Time:  9:00 a.m.<br>Judge  Hon. Jeffrey S. White<br>Ctrm: 2 |

**DECL. OF ROBERT S. NELSON ISO APPLICATION FOR FEES AND COSTS**
**Case No. C-07-3465 JSW**
\283325.1EMPLOY

I, ROBERT S. NELSON, declare as follows:

1. I have personal knowledge of the facts stated herein, and could testify competently thereto if called upon to do so.

2. I am an attorney admitted to practice in the State of California and in the Northern and Central Districts of California. I am attorney-of-record for Plaintiffs in this action.

3. I am the principal of the Nelson Law Group ("NLG"), a San Bruno, California-based law practice specializing exclusively in labor and employment law. NLG has been in existence since June 2006. Prior to that time, I practiced labor and employment law with the firms Curiale Dellaverson Hirschfeld & Kraemer LLP (from 2004 until 2006), a California-based, management-side labor and employment firm; and Fisher & Phillips LLP (from 2002 until 2004), a national labor and employment firm with offices in the San Francisco Bay Area.

4. Prior to founding NLG, I was actively involved in the defense of several wage-and-hour class and/or collective actions, including *Dudash v. Varnell Struck & Associates*, C-04-02748 MHP. Since founding NLG, I have served as lead counsel in both the present case and *Cayer v. Washington Mutual Bank*, CV-07-00875 JSW, a wage-and-hour class and collective action currently pending before this Court. In addition, I am currently serving as local counsel in *Jaffe, et al. v. Morgan Stanley DW, Inc.*, C-06-03903 TEH, a discrimination class action under Title VII.

5. In January 2007, I was contacted by Plaintiffs Ben Campopiano and Angela Badami about the prospect of taking this case. I met with Mr. Campopiano and Ms. Badami at length, and also had several telephone conversations with them. Mr. Campopiano and Ms. Badami (and subsequently Plaintiffs Kathryn Raven and Audrey Ward, who I also met with in January 2007) told me about their experiences as former employees of Defendant Grassroots Campaigns, Inc. ("GCI"). Specifically, they described to me, in great detail: GCI's business; their respective job titles (all had worked as either Canvass Directors, Assistant Canvass Directors or Field Organizers); the job duties of each different job; how much they were paid; how much they worked; whether and to what extent they could document how much they worked; whether

**DECL. OF ROBERT S. NELSON ISO APPLICATION FOR FEES AND COSTS**
Case No. C-07-3465 JSW

1

\283325.1EMPLOY

they were required by GCI to work as much as they did; and their respective dates of employment. Mr. Campopiano also told me that he had been required to work an unpaid "observation" day at the start of his employment with GCI.

6. After meeting with Plaintiffs, I began thoroughly researching GCI and its business. Specifically, I accessed and read all pages, links and attachments to GCI's web site; reviewed documents that were provided to me by Plaintiffs regarding work conditions and/or requirements at GCI; and conducted online research about GCI and its clients, including researching the amount of payment GCI has received from the Democratic National Committee ("DNC") and MoveOn.org, two of the company's biggest clients.

7. As part of my research, I also requested a credit and risk report of the company by Dun & Bradstreet ("D&B"). The D&B official to whom I spoke indicated that GCI did not appear to own any real estate or significant assets anywhere throughout the country; that it had paid numerous bills and/or debts late; and that it had a below-average credit rating.

8. Based on the above-noted research and findings, I determined that GCI was a relatively new company that provided fundraising/consulting services to the DNC, MoveOn and other progressive causes and/or candidates; it appeared to have no tangible assets or inventory; and it had a questionable credit rating and history of bill payments. I therefore determined that GCI was a likely bankruptcy risk if liability and/or litigation costs became too high.

9. Despite my concerns, I nonetheless agreed to take the case. I was a solo practitioner at the time I agreed to take the case; my practice had only been in existence for approximately six months. During the time that this matter was litigating, I delayed and turned down other clients (and potential clients) who asked me to represent them in other matters.

10. Between August and November 2007, 36 people signed and sent me Consent to Join forms seeking to opt into this case. I interviewed all the people who opted in at length, asking them substantially the same questions I previously asked the named Plaintiffs. I also requested and reviewed any and all documents the opt ins had regarding GCI.

**DECL. OF ROBERT S. NELSON ISO APPLICATION FOR FEES AND COSTS**
Case No. C-07-3465 JSW
\283325.1EMPLOY

2

11. In or about early October 2007, the parties agreed to conduct early mediation in this case. As a condition of early mediation, I requested that GCI voluntarily provide information needed to calculate the existence and/or extent of class claims, including the numbers of people who worked in jobs that Plaintiffs alleged had been mistakenly classified as exempt from state and/or federal overtime and minimum wage requirements, as well as the amount of time they worked for GCI. I furthermore requested that GCI provide the number of people who had been required to work unpaid observation days for which they were not paid.

12. On November 21, 2007, the parties had an all-day mediation with Judge Edward R. Infante (Ret.), one of the most respected wage-and-hour class action mediators in California. A recent reader survey by The Recorder legal newspaper ranked Judge Infante as the best mediator in the San Francisco Bay Area.

13. The mediation was conducted at arms' length via "caucus" negotiations facilitated by Judge Infante (i.e., negotiations where the parties are kept in separate rooms and the mediator shuttles offers and responses between them). At the conclusion of the mediation, the parties agreed to settle the claims of a defined settlement class consisting of everyone who had worked for GCI in California for a set salary that is less than the state's minimum wage; everyone who worked an unpaid observation day, both in and outside of California; and everyone who affirmatively opted into the case. The settlement terms are accurately described in the Joint Stipulation of Settlement and Release ("Settlement Agreement") that was filed with the Court.

14. In December 2007, the parties jointly filed a Motion for Preliminary Approval of the Settlement Agreement. I performed substantial amounts of work drafting, editing and filing the motion documents.

15. The parties jointly retained Gilardi & Co., LLC ("Gilardi"), a San Rafael-based claims administrator, to handle both Notice distribution and ultimate payment of settlement shares in this case. On or about March 31, 2008, a representative of Gilardi, Maria Hanken, called me and said that on March 28, 2008, Gilardi mailed copies of the Notice of the parties' Settlement Agreement to the last-known addresses of 2,091 Class Members, the entire Settlement Class. The

Notice stated the specific amounts Plaintiffs were requesting in attorneys' fees and costs, and the procedure for objecting to these amounts.

16. I remained in regular contact with Gilardi representatives after the Notices were sent. Ryanne Fitzgerald, another Gilardi representative, provided me with regular updates of how many Notices were returned as undeliverable, and how many Class Members contacted Gilardi to question, opt out of, or object to the Settlement. Ms. Fitzgerald told me that, of the original 2,091 Notices that Gilardi mailed, approximately 373 were returned as undeliverable. Ms. Fitzgerald told me that approximately 12 of the returned Notices contained forwarding addresses; Gilardi immediately re-mailed the Notices to those new addresses. Ms. Fitzgerald furthermore explained that Gilardi performed "skip trace" searches for the remaining 360 returned Notices that did not contain new forwarding addresses. Through those searches, Gilardi was able to locate new addresses for approximately 300 of the undeliverable Notices; the company then re-mailed the Notices to those new addresses.

17. On May 12, 2008, the deadline for Class Members to object to and/or opt out of the Settlement, Ms. Fitzgerald sent me an email summarizing the numbers of Class Members who had opted out of, and/or objected to, the Settlement as of that date. According to Ms. Fitzgerald's email, 17 people returned "completed" opt-out forms (i.e., forms that were correctly filled out and signed); another 7 people returned "incomplete" opt-out forms (i.e., forms that were returned but were either not fully filled out, and/or were not signed). The parties jointly agreed to treat incomplete opt outs as effective opt outs for the purposes of this Settlement.

18. According to Ms. Fitzgerald's email, no Class Members objected to the Settlement as of May 12, 2008.

19. Sometime after April 1, 2008, I received a copy of a letter from Richard Aaron Mead, who purported to be a member of the Settlement Class; the original of the letter was addressed to the Court. The letter generally expressed satisfaction with the parties' settlement, specifically saying that the author was "very much in favor of the Settlement."

///

20. Sometime after April 28, 2008, I received a copy of a letter from Teri Solomo, who purported to be a member of the Settlement Class; the original of the letter was addressed to the Court. The letter generally expressed satisfaction with the parties' settlement, specifically saying that the author was "totally in agreement with the lawsuit against" GCI.

21. In addition to the above-noted letters, since April 2008 I have received numerous calls from Settlement Class members expressing support for, and appreciation of, the Settlement.

22. This litigation involved large amounts of risk, complexity and work. I spent substantial amounts of time on this litigation that could otherwise have been spent on other matters, including fee-generating work.

23. I made every effort to litigate this action in an efficient and cost-effective manner; I also exercised billing judgment to delete billed time that I believed was excessive, redundant or unnecessary.

24. After the exercise of billing judgment, as of the date of this filing, I spent a total of 186.4 hours on this matter. I determined the total number of hours that I billed by reviewing task-based billing records I maintained for this case since its inception. I was the only attorney who billed time on behalf of Plaintiffs in this matter. I track my time using spreadsheets, created using Word 2003, to record: (1) the specific tasks I perform for each client; (2) the amount of time I spend on each task; (3) the billable rate that applies to each segment of time that I bill (this generally remains constant); and (4) the total dollar amount billed to each task. These records contain specific, sometimes confidential descriptions of work I performed (e.g., descriptions of interviews with third-party witnesses who wish to remain confidential) and as such, I am reluctant to include them as attachments to a document filed in Court. In the interests of minimizing additional work in this matter, I did not want to spend the time needed to redact confidential and/or privileged information from my time records. I can of course do so if the Court so requests.

25. The specific work I performed in this case included, among other things:
- Initial client meetings and consultations;

**DECL. OF ROBERT S. NELSON ISO APPLICATION FOR FEES AND COSTS**
Case No. C-07-3465 JSW
\283325.1EMPLOY

5

- Factual investigations and due diligence;
- Counsel and assistance for class members;
- Reviewing and assimilating documents and other case information;
- Legal research for, and drafting of, complaints, filings, a detailed mediation brief, and documents needed to effect the parties' settlement;
- Settlement discussions and mediation; and
- Counseling class members who contacted me with questions about the litigation and Settlement.

26. My current hourly rate is $450.00. This rate is supported by my skill level and experience litigating wage-and-hour class action cases.

27. I have personal knowledge of the hourly rates charged by other attorneys with comparable experience in the San Francisco Bay Area ("Bay Area") market. Based on that information, I believe that my rate of $450.00 per hour is fully consistent with the market rate in the Bay Area for attorneys with comparable skill, expertise, experience and qualifications. I also have personal knowledge that local attorneys who frequently serve as lead counsel in wage-and-hour class action cases sometimes bill as much as $600.00 or $700.00 per hour.

28. I also had to incur substantial costs in the course of this litigation, including expenses associated with the preparation, research and filing of the complaint and other pleadings in this matter; fees paid to web and other media consultants; costs associated with copying and/or binding documents; mail and/or messenger fees; and costs associated with retaining a mediator and attending mediation. I advanced all these costs and expenses with no guarantee that they would ultimately be recovered. I have not yet been reimbursed for any of the monies I expended to cover case costs.

29. All total, I incurred $8,234.10 in costs in this litigation. I determined this figure by reviewing the Word 2003 spreadsheets I have maintained for this case since its inception (I separately track costs on the spreadsheets; see Paragraph 24).

30. The provision in the parties' Settlement Agreement stating that, with Court approval, GCI will pay $150,000.00 in attorneys' fees and no more than $8,500.00 in costs was negotiated at arms' length with the assistance of an experienced class action mediator. There was no trade-off in relief to the Class Members in exchange for attorneys' fees and/or costs.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed this twenty-third day of May, 2007.

                                                /S/ Robert S. Nelson
                                                   Robert S. Nelson